## IN THE UNITED STATES DISTRICT COURT
## FOR THE EASTERN DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| **DIANE ZELESNICK,** | : | |
| **Plaintiff** | : | **CIVIL ACTION** |
| | : | |
| **v.** | : | |
| | : | |
| **TEMPLE UNIVERSITY HEALTH** | : | |
| **SYSTEM, INC. d/b/a TEMPLE** | : | |
| **HEALTH SYSTEM** *et al.,* | : | **No. 19-5820** |
| **Defendants** | : | |

## MEMORANDUM

PRATTER, J.                                             JANUARY *19*, 2020

Plaintiff Diane Zelesnick worked at the Fox Chase Cancer Center[1] for about four and a half months before she was fired. During that time, she was repeatedly criticized for a variety of performance issues, and an acrimonious relationship with her supervisor, Nancy Warren, developed. Ms. Zelesnick also suffered from a variety of medical conditions which worsened during her short time at Fox Chase. Near the end of her tenure, Ms. Zelesnick applied for medical leave to have surgery on her shoulder. She was fired shortly thereafter. Ms. Zelesnick alleges a variety of claims under the ADA and FMLA,[2] including Retaliation, Failure to Accommodate,

---

[1]     Temple University Health System manages a network of hospitals and clinics, including the Fox Chase Cancer Center. (Doc. No. 1 at 3.) The American Oncologic Hospital is likewise a part of the Temple University Health System. *Id.* Zelesnick's paystubs and W-2 forms listed The American Oncologic Hospital as her employer. *Id.* The three entities (Fox Chase, The American Oncologic Hospital, and Temple University Health System) "were used interchangeably on Plaintiff's employment documents and internal documents." *Id.* These entities are collectively referred to as "Defendants" throughout this memorandum.

[2]     After briefing was complete on the Motion for Summary Judgment, the parties stipulated to permit Ms. Zelesnick to file an Amended Complaint. Her Amended Complaint adds claims under the Pennsylvania Human Relations Act ("PHRA") and the Philadelphia Fair Practices Ordinance ("PFPO"). As noted by the parties, the PHRA and PFPO claims mirror those brought under the ADA. For this reason, to the extent that the Court grants summary judgment as to certain of Ms. Zelesnick's ADA claims, the Court also grants summary judgment as to counterpart claims under the PHRA and PFPO.

Disability Discrimination, Hostile Work Environment, and FMLA Interference. Defendants have moved for summary judgment on all of these claims. For the reasons that follow, Defendants' motion for summary judgment is granted in part and denied in part.

## I. Background

Plaintiff Diane Zelesnick began working at the Fox Chase Cancer Center on April 21, 2019.[3] Def. Ex. 10. Before moving to Fox Chase, she had worked for almost three years at Jeanes Hospital which, like Fox Chase, is an affiliate of the Temple Health System. Def. Ex. 1. Ms. Zelesnick was hired at Fox Chase as an "Infection Control Practitioner." Def. Ex. 10. Her primary responsibility was categorizing infections and determining whether they had been acquired at the hospital. Def. Ex. 2 at 62:15-19. Ms. Zelesnick was the only person in that role. *Id.* at 45:19-24. Nancy Warren was the previous Infection Control Practitioner, and was promoted to the role of Infection Control Manager on the same day that Ms. Zelesnick was hired. *Id.* As Infection Control Manager, Ms. Warren was charged with supervising Ms. Zelesnick. *Id.* at 76:5-7.

Ms. Zelesnick testified that she wanted to move from Jeanes to Fox Chase because her job at Jeanes "was just very overwhelming," and she was also dealing with four other "major stressors": her husband had lost his business and was out of work, they were selling their house, their dog had cancer and had only months to live, and her aunt had passed away. *Id.* at 51:8-52:3.

### A. April - May

Ms. Zelesnick testified that while her job was going well in late April and early May, she did suffer from pain in her lower back and in her bladder. *Id.* at 82:5-7. To ameliorate these symptoms, Ms. Zelesnick requested a more comfortable desk chair on May 6. *Id.* She received the chair that she picked out online. *Id.* at 82:11-14.

---

[3]     Unless otherwise noted, all events described in this Memorandum occurred in 2019.

2

Ms. Zelesnick did not take any sick days in May. *Id.* at 92:13-93:1. She did, however, take four days off for a previously planned vacation. *Id.*

In late May, Ms. Warren and Holly Molle met to discuss Ms. Warren's concerns with Ms. Zelesnick's work performance. Def. Ex. 8 at 79:4-24. Ms. Molle was Ms. Zelesnick's designated HR contact. Def. Ex. 2 at 171:1-7. During that meeting, Ms. Warren expressed her concerns that Ms. Zelesnick was not following a steady routine, did not follow through, and did not ask questions when she did not understand a task. Def. Ex. 8 at 79:4-24, 90:7-91:23. Ms. Warren also told Ms. Molle that Ms. Zelesnick lacked focus, caused at least in part by Ms. Zelesnick's personal issues. *Id.* at 79:7-11. In particular, Ms. Warren noted that Ms. Zelesnick took many phone calls, including calls to a car dealership and insurance company to deal with car trouble. *Id.* at 79:17-80:16. Ms. Molle told Ms. Warren to monitor the situation, and to have weekly follow-up conversations with Ms. Zelesnick. *Id.* at 60:1-15.

Ms. Zelesnick agreed that she took phone calls for personal issues during work hours, and that she was very stressed by her car repair, dealing with the insurance company, and her young niece's illness. Def. Ex. 2 at 89:9-90:18, 93:5-9. None of these calls were related to Ms. Zelesnick's own medical issues. In late May, Ms. Warren and Ms. Zelesnick met to discuss Ms. Warren's concerns. *Id.* at 88:9-18. Ms. Warren suggested that Ms. Zelesnick limit personal calls in the office to her lunch and break times as a way to improve her focus, because the calls tended to upset Ms. Zelesnick and disrupted the office. *Id.* at 101:1-6.

Ms. Zelesnick started talking with Ms. Warren about her medical issues in May. *Id.* at 243:14-19. It was at this time that she told Ms. Warren that she had "generalized anxiety that was diagnosed a long time ago," and that she had gone back to a psychiatrist to get on the right medication. *Id.* at 189:22-190:10. She also told Ms. Warren about her knee, shin, shoulder, and

3

bladder conditions. *Id.* at 243:20-24. When asked how Ms. Warren responded to this information, Ms. Zelesnick testified: "She was like, okay. No big deal." *Id.* at 244:1-3.

## B. June

Ms. Warren and Ms. Zelesnick met on or about June 6 to discuss Ms. Zelesnick's performance. *Id.* at 94:13-95:5. Ms. Zelesnick testified that Ms. Warren was very agitated, came out of her office with a piece of paper, was "waving it," and spoke in a tone that was "really not very nice." *Id.* at 95:2-5. During this meeting, Ms. Warren told her that she was not focusing enough on her job. *Id.* at 95:6-10. The paper that Ms. Warren gave Ms. Zelesnick was titled "Follow-up Performance Discussions," and was dated June 10.[4] That document suggested that Ms. Zelesnick limit personal calls to break or lunch, to ask questions when a directive is unclear, and to follow a developed routine. Def. Ex. 17. Ms. Zelesnick said that she was "so shocked that [Ms. Warren] felt this way," that this negative feedback was "totally unexpected," and that she felt that Ms. Warren should not have talked to her in that way. Def. Ex. 2 at 95:1-15. Ms. Zelesnick also told Ms. Warren that she needed help looking at charts. Def. Ex. 8 at 95:16-19; Def. Ex. 2 at 103:15-23. On that same day, Ms. Warren gave her the instruction that she had asked for, and Ms. Zelesnick testified that that the instruction was helpful. Def. Ex. 2 at 103:15-23.

Ms. Zelesnick took off her first sick day on June 10, 2019 for a urinary tract infection. Def. Ex. 3 at 110:18-22. She texted Ms. Warren and left her a voicemail saying that she would not be coming into work that day. Def. Ex. 2 at 107:13-17. Ms. Warren texted back and told Ms. Zelesnick to "rest and feel better." *Id.* at 107:19-22. Ms. Zelesnick also took one and one-half days off for vacation, and three days to attend a conference. Def. Ex. 16.

---

[4]     Ms. Zelesnick initially testified that the date was "June 6th, I will never forget [it]." Def. Ex. 2 at 95:4. Neither party addresses this date discrepancy, but this difference is not dispositive to the Court's analysis.

4

### C. July

Ms. Zelesnick's health conditions worsened in July, causing her to schedule several doctor's appointments. Def. Ex. 2 at 112:17-19. She did not take any time off in the month of July for these medical appointments. Def. Ex. 16. Instead, she tried to schedule some for after work, but also scheduled some for during the workday. Def. Ex. 2 at 112:23-113:4. Ms. Warren did not always know why Ms. Zelesnick was taking time out of the workday, but knew that some of these absences were for medical appointments. Def. Ex. 8 at 102:8-10.

Ms. Zelesnick testified that Ms. Warren was generally amendable her taking time off for a doctor's appointment "as long as it didn't interfere with my work." Def. Ex. 2 at 245:7-11. However, Ms. Warren did ask multiple times that Ms. Zelesnick tell her how often the appointments would last if they were scheduled during the workday. *Id.* at 121:22-122:2. Ms. Zelesnick did not believe this was appropriate. "I just thought that I was going to be treated as a professional . . . not like somebody that was going to be monitoring me the whole time. . . . Because I wasn't treated that way when I was at Jeanes." *Id.* at 122:6-11. Ms. Zelesnick also testified that Ms. Warren "micromanaged" her. *Id.* at 123:21-23.

Ms. Zelesnick also felt that Ms. Warren was upset that Ms. Zelesnick was scheduling too many appointments in the middle of the day, and was upset that Ms. Zelesnick did not tell her how long the appointment would be in advance. *Id.* at 248:5-13. According to Ms. Zelesnick, Ms. Warren would generally get upset when she was late or took time off in the middle of the day, whether that was because she overslept, was on the phone, or was attending doctor's appointments. *Id.* at 114:12-24, 116:14-17. Ms. Warren denied being upset that Ms. Zelesnick took time to attend doctor's appointments. *Id.*

Sometime in late July, Ms. Zelesnick told Ms. Warren that she would need to have shoulder surgery. *Id.* at 116:23-117:1. Ms. Zelesnick testified that Ms. Warren was supportive of her having

5

the surgery. *Id.* at 212:3-5.  On July 26, 2019, Ms. Warren followed up on their conversation and emailed Ms. Zelesnick information about Fox Chase's process for requesting leave under the FMLA through a third-party vendor called "Matrix."  Def. Ex. 20.  The email read: "Making sure you got this.  You may want to reach out to find out the new process for medical leaves."  Def. Ex. 20.

### D.  August - September

Ms. Zelesnick's 90-day probationary period was scheduled to end on July 21st, but Ms. Warren and Ms. Molle decided to extend her probationary period to account for the days that Ms. Zelesnick had taken off.  Def. Ex. 23.  Instead, Ms. Warren and Ms. Zelesnick met on or around August 9 to discuss her 90 Day Evaluation.  Def. Ex. 2 at 124:16-21.  This evaluation rated Ms. Zelesnick as "failed to meet expectations" in four categories: personal accountability, job duties, quality of work performed, and quantity of work performed.  Def. Ex. 21.  The evaluation specifically noted that Ms. Zelesnick "needs to improve her follow through and develop a more consistent process."  *Id.*

Ms. Zelesnick said that Ms. Warren was "nasty" when she presented this evaluation making Ms. Zelesnick "very upset."  Def. Ex. 2 151:1-2, 152:4-5.  Ms. Zelesnick drafted a response, which she gave to Ms. Warren a few days later.  Def. Ex. 22.  This response stated that learning conditions had not been ideal, and that there was not an "atmosphere of acceptance and approval," which prevented Ms. Zelesnick from asking questions.  *Id.*  Ms. Zelesnick noted that part of what prevented her from progressing is that Ms. Zelesnick and Ms. Warren had not been in the office together enough.  *Id.*  She wrote: "We both had vacations, appointments, health issues, family emergencies and an APIC 3 day convention."  *Id.*  Finally, Ms. Zelesnick stated that she could not be expected to have learned all of the infection classifications already.  *Id.*  In her testimony, Ms.

6

Zelesnick noted that others had told her that it would take a year to learn all of the infections. Def. Ex. 2 at 148:7-22.

Ms. Zelesnick testified that Ms. Warren became very upset when she read Ms. Zelesnick's response. Ms. Warren came out of her office "waiving [sic] it to me and yelling and screaming, I am not handing this in, I do not like it." *Id.* at 131:4-8. In particular, Ms. Warren told Ms. Zelesnick: "You're the one that took all the vacations and the doctor appointments, not me." *Id.* at 131:19-21. Ms. Zelesnick conceded that her response was not worded correctly, as Ms. Warren did not have health issues or family emergencies in June or July. *Id.* at 154:2-13. Ms. Warren testified that she was upset at Ms. Zelesnick's response because it "didn't reflect any of what I had intended or what I had documented on that report." Def. Ex. 8 at 169:3-9. In particular, Ms. Zelesnick had said that Ms. Warren expected her to master "everything, all my classifications," while Ms. Warren had said on the evaluation that she only wanted Ms. Zelesnick to master two infections. Def. Ex. 2 at 127:1-12. Ms. Zelesnick admitted during her deposition that the 90-Day Evaluation only stated that Ms. Warren wanted her to learn two infections, not all of them. *Id.* at 147:19-148:6.

Ms. Warren wrote contemporaneous notes to this meeting, which have been filed as an exhibit. The most relevant portion of that note reads: "In her improvement section I stated that she needed to master the two infections that she had been working on before taking on anything new; never did I indicate that she needed to master everything. . . . Diane has had multiple health issues, appointments and family emergencies. I try to be accommodating to her needs. In fact, that was never addressed as part of her evaluation. I also had to address her use of work time for personal matters in the form of a written Memo back in June." Def. Ex. 23. Ms. Warren elaborated on the note in her testimony saying: "[Ms. Zelesnick's] responses were about things that I didn't even

7

bring up about health issues and vacations . . . ." Def. Ex. 8 at 168:15-17. Ms. Warren further testified that the only reason she mentioned health issues is that Ms. Zelesnick mentioned them first. *Id.* at 173:3-18.

Later in August, Ms. Warren and Ms. Molle decided to extend Ms. Zelesnick's probationary period for another 30 days. *Id.* at 99:24-100:2. Ms. Warren explained that the purpose of this extended probationary period was to see if Ms. Zelesnick could learn one area well, which Ms. Warren believed would increase Ms. Zelesnick's confidence. *Id.* at 98:16-99:2.

On August 19, 2019, Ms. Zelesnick went to the HR office to speak with Ms. Molle, who was her designated HR Business Partner. Def. Ex. 2 at 167:14-16. Ms. Molle was on vacation, but Amber Medlin, who is also an HR Business Partner, invited Ms. Zelesnick into her office. *Id.* at 169:19-170:7. Ms. Zelesnick first told Ms. Medlin about "some sort of health condition." Def. Ex. 25 at 21:10-13. Ms. Medlin provided Ms. Zelesnick with the description of the FMLA leave process. Def. Ex. 2 at 170:8-10. After having dealt with the FMLA leave question, Ms. Zelesnick told Ms. Medlin that she was having issues with Ms. Warren. She told Ms. Medlin that Ms. Warren had made her cry on several occasions, yelled at her when she asked to be trained in a new infection, made her feel bad for being gone two hours during a workday, and reacted negatively to Ms. Zelesnick's initial response to her 90-day performance evaluation. Def. Ex. 26. Ms. Zelesnick also said she felt it was unfair that she was being evaluated so closely after only 90 days. Def. Ex. 2 at 173:1-15.

After meeting with Ms. Zelesnick, Ms. Medlin wrote an email to Ms. Molle containing her meeting notes. Def. Ex. 26. While this email does state that Ms. Zelesnick complained that Ms. Warren had yelled at her, the email does not indicate that Ms. Medlin and Ms. Zelesnick discussed Ms. Warren's comments regarding Ms. Zelesnick's medical appointments. *Id.* Ms. Medlin

8

testified that Ms. Zelesnick never mentioned this, and that if she had, that information would have been reflected in the email. Def. Ex. 25 at 28:22-24, 45:3-17. Ms. Zelesnick testified otherwise, stating that she did in fact tell Ms. Medlin that Ms. Warren made negative comments about her medical appointments. Def. Ex. 2 at 170:1-3, 172:21-173:8.

On the same day she visited Ms. Medlin, Ms. Zelesnick applied for FMLA leave through Matrix, the third-party administrator for Fox Chase's FMLA system. Def. Ex. 27. Her doctor submitted medical certification for her application four days later, on August 23. Def. Ex. 29. Ms. Zelesnick's requested leave was to start only three days later, on August 26. Def. Ex. 27. Later on August 23, Ms. Zelesnick contacted Matrix and asked that the FMLA leave start date be moved from August 26 to September 23. Def. Ex. 29. Ms. Zelensick testified that after Ms. Warren received notice of her FMLA leave application, Ms. Warren pressured her to delay her surgery to September 23 because Ms. Warren was taking a vacation on September 9. Def. Ex. 2 at 210:7-211:20. Ms. Zelesnick's testimony about how Ms. Warren pressured her is somewhat unclear. She testified that Ms. Warren "kind of, like, wanted me to do that because she was going away to San Diego. Because she kept talking about it." *Id.* at 210:7-211:20.

On August 27, Ms. Warren emailed Ms. Molle telling her that there were "continued issues" with Ms. Zelesnick. Def. Ex. 31. She summarized these issues in a document titled "Performance Improvement Update." Def. Ex. 32. The update mentioned Ms. Zelesnick's failure to use a consistent process, to follow through on tasks, and multiple activities that were either late or never done. *Id.*

Ms. Warren and Ms. Molle met on August 28, 2019. Def. Ex. 7 at 112:19-22; Def. Ex. 8 at 220:7-16. They used the Performance Improvement Update document as talking points. Def.

9

Ex. 8 at 183:1-3. During that meeting, they decided to terminate Ms. Zelesnick's employment. *Id.* at 216:21-217:4; Def. Ex. 7 at 104:24-105:7.

On August 30, Matrix approved Ms. Zelesnick's FMLA leave. Def. Ex. 33. Ms. Molle received a report from Matrix on August 31, which notified her that Ms. Zelesnick had been approved for FMLA leave. Def. Ex. 34.

On September 3 and 4, 2019, Ms. Molle and Ms. Warren met with three other employees at Fox Chase to let them know that Ms. Zelesnick was going to be fired. Def. Ex. 7 at 112:6-10. One of these other employees was Dr. Beverly Sherbondy. Dr. Sherbondy gave the final approval to fire Ms. Zelesnick. Def. Ex. 36 at 28:2-11. Ms. Molle testified that she also discussed Ms. Zelesnick's termination with another employee, Vjera Silbert, to make sure that Ms. Silbert approved of Ms. Zelesnick's termination. Def. Ex. 7 at 161:8-14. Ms. Silbert did not recall this conversation, but said that she does provide guidance to her HR colleagues generally. Def. Ex. 39 at 24:1-9. Finally, Ms. Warren met with Dr. Helstrom to let him know that Ms. Zelesnick was going to be fired. Def. Ex. 9 at 43:5-9. Dr. Helstrom agreed with the decision to terminate Ms. Zelesnick's employment. Def. Ex. 8 at 132:2-4.

On September 4, 2019, Ms. Zelesnick told Ms. Warren that she had received FMLA leave, and gave her the FMLA paperwork. Def. Ex. 8 at 104:17-21. Ms. Warren asked Ms. Molle if there was anything she had to do with the paperwork. Def. Ex. 41. Ms. Warren testified that this was the first time she learned that Ms. Zelesnick had been approved for FMLA leave. Def. Ex. 8 at 104:17-21.

On September 6, 2019, Ms. Warren and Ms. Molle met with Ms. Zelesnick to let her know that she was being fired. Def. Ex. 2 at 193:24-194:3; Def. Ex. 7 at 52:9-11. Ms. Zelesnick sent an email to Ms. Molle and Dr. Helstrom later that day stating that the decision was "unfair and

10

shocking." Def. Ex. 43. She stated that Ms. Warren "retaliated against me when I responded to her evaluation and that is illegal." *Id.* She also stated that her doctor had approved her for "a mental anguish FMLA because of my 'Hostile' work environment." *Id.* This email also said: "I felt bad afterwards for Nancy and decided to push it back until my surgery date because I knew she was going on vacation." *Id.*

Ms. Zelesnick called Dr. Sherbondy to discuss her termination on September 11, 2019. Def. Ex. 2 at 212:17-22. According to Dr. Sherbondy's notes from the call, Ms. Zelesnick stated that she believed Ms. Warren retaliated against her because she received FMLA leave. Def. Ex. 44.

## LEGAL STANDARD

Summary judgment is appropriate "if the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c). An issue is "genuine" if there is a sufficient evidentiary basis on which a reasonable jury could return a verdict for the non-moving party. *Kaucher v. Cnty. of Bucks*, 455 F.3d 418, 423 (3d Cir. 2006) (citing *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986)). A factual dispute is "material" if it might affect the outcome of the case under governing law. *Id.*

On a motion for summary judgment, the Court must view the evidence presented in the light most favorable to the non-moving party. *See Anderson*, 477 U.S. at 255. However, "[u]nsupported assertions, conclusory allegations, or mere suspicions are insufficient to overcome a motion for summary judgment." *Betts v. New Castle Youth Dev. Ctr.*, 621 F.3d 249, 252 (3d Cir. 2010).

11

The movant is initially responsible for informing the Court of the basis for the motion for summary judgment, and identifying those portions of the record that demonstrate the absence of any genuine issue of material fact. *See Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986). Where the non-moving party bears the burden of proof on a particular issue, the moving party's initial burden can be met simply by "pointing out to the district court that there is an absence of evidence to support the nonmoving party's case." *Id.* at 325. After the moving party has met the initial burden, the non-moving party must set forth specific facts showing that there is a genuinely disputed factual issue for trial by "citing to particular parts of materials in the record, including depositions, documents, electronically stored information, affidavits or declarations, stipulations . . . , admissions, interrogatory answers, or other materials" or by "showing that the materials cited do not establish the absence or presence of a genuine dispute." Fed. R. Civ. P. 56(c). Summary judgment is appropriate if the non-moving party fails to rebut by making a factual showing "sufficient to establish the existence of an element essential to that party's case, and on which that party will bear the burden of proof at trial." *Celotex*, 477 U.S. at 322.

## DISCUSSION

## II.     ADA Causes of Action

### A. ADA Retaliation

An ADA retaliation claim follows the familiar *McDonnel-Douglas* burden shifting framework. First, a plaintiff must allege a prima facie case of retaliation. To make out a prima facie case, a plaintiff must show that "(1) the employee engaged in a protected employee activity; (2) the employer took an adverse employment action after or contemporaneous with the employee's protected activity; and (3) a causal link exists between the employee's protected activity and the employer's adverse action." *Abramson v. William Paterson Coll. of N.J.*, 260 F.3d 265, 286 (3d Cir. 2001). Second, the defendant must articulate a legitimate, non-discriminatory

12

reason for the adverse action. *See Wells v. Retinovitreous Assocs., Ltd.*, 702 F. App'x 33, 36 (3d Cir. 2017). Third, the plaintiff must demonstrate that the defendant's proffered reason is pretextual. *See id.*

There are three contested issues related to Ms. Zelesnick's ADA Retaliation claim: first, whether she engaged in a protected employee activity; second, whether a causal link exists between the protected activity and the adverse action; and third, whether Ms. Zelesnick can demonstrate that Defendants' proffered reason is pretextual.

### i. Whether Ms. Zelesnick Engaged in a Protected Employee Activity

Defendants offer only one argument why Ms. Zelesnick did not engage in a protected employee activity. They argue that during her conversation with Ms. Medlin, Ms. Zelesnick never mentioned disability discrimination. The first problem with this argument is that there is a question of fact as to whether Ms. Zelesnick mentioned her concern that Ms. Warren was penalizing her for taking time off for medical appointments. Ms. Zelesnick testified during her deposition that she did convey this concern to Ms. Medlin. *See* Def. Ex. 2 at 248:21-249:1. It is true, as Defendants say, that Ms. Medlin disagreed, and said that if Ms. Zelesnick had done so, Ms. Medlin would have mentioned it in her August 26 email to Ms. Molle. But whether to credit Ms. Zelesnick or Ms. Medlin's recollection of events is a quintessential question of fact, and must be left to the jury. *See, e.g.*, *Marino v. Indus. Crating Co.*, 358 F.3d 241, 247 (3d Cir. 2004) ("In considering a motion for summary judgment, a district court may not make credibility determinations or engage in any weighing of the evidence . . . .").

And even if Ms. Zelesnick did not complain of discrimination or retaliation to Ms. Medlin, Plaintiff alleges that she engaged in other protected activity as well, including taking intermittent time off for medical appointments, and planning to take time off for a shoulder surgery. Requesting a leave of absence may be a request for a reasonable accommodation under the ADA

13

if it would enable the employee to perform the job's essential functions in the near future. *See, e.g.*, *Bernhard v. Brown & Brown of Lehigh Valley, Inc.*, 720 F. Supp. 2d 694, 703 (E.D. Pa. 2010). Given that Defendants' briefs do not contest that these activities were protected activity under both the ADA and the FMLA, Ms. Zelesnick has made out this element of her prima facie case.

> ## ii. Whether a causal link exists between Ms. Zelesnick's protected activity and the adverse action

Next, Ms. Zelesnick must show some evidence of a causal link between the protected activity and the adverse action. "To determine whether the causal connection requirement has been fulfilled, the Third Circuit has focused on timing and evidence of ongoing antagonism." *Dogmanits v. Capital Blue Cross*, 413 F. Supp. 2d 452, 463 (E.D. Pa. 2005).

Ms. Zelesnick argues that the timeline strongly supports her claim: she filed for FMLA leave on August 19, 2019, and was terminated on September 6. But the uncontroverted record shows that Ms. Warren and Ms. Molle decided to terminate Ms. Zelesnick on August 28, and at that time neither had received notice of her FMLA leave. Ms. Molle received notice on August 30, and Ms. Warren did not receive notice until September 4, when Ms. Zelesnick told her that her FMLA leave was approved.

In order to avoid this problem, Ms. Zelesnick argues that Ms. Warren actually learned that she was preparing to take leave for a shoulder surgery, at the latest, on July 26, as evidenced by her forwarding an email containing Defendants' FMLA leave procedures on that date. Indeed, construing the facts in a manner most favorable to the Plaintiff, the Court must agree that Ms. Warren had notice that Ms. Zelesnick intended to take FMLA leave no later than July 26.

Even so, this creates an additional problem for Ms. Zelesnick. Under this timeline, there was at least a one-month gap between when Ms. Warren learned that Ms. Zelesnick was preparing to file for FMLA leave, and Ms. Warren's and Ms. Molle's termination decision. The Third Circuit

14

has noted that a 29-day gap between protected activity and alleged retaliatory activity, without more, would not be sufficient by itself to demonstrate causation. *See Williams v. Phila. Hous. Auth. Police Dep't*, 380 F.3d 751, 760 n.4 (3d Cir. 2004) (even if gap between application for leave and retaliation was only 29 days, rather than 96 days, plaintiff would not have demonstrated causation). Thus, the timeline alone cannot make out Ms. Zelesnick's prima facie claim.

Where temporal proximity alone is insufficient to prove causation, courts look to "ongoing antagonism" during the interim period. *See Mercer v. Se. Pa. Transit Auth.*, 26 F. Supp. 3d 432, 447 (E.D. Pa. 2014). Ms. Zelesnick has introduced such evidence of ongoing antagonism. According to her testimony, Ms. Warren became angry with her and yelled at her for visiting the doctor on multiple occasions. A reasonable jury could find on this evidence that Ms. Zelesnick taking time off for doctor's appointments—which, as noted above, Defendants do not contest was protected activity under the ADA—caused the "relationship to deteriorate, and set a pattern of behavior" that culminated in termination. *Robinson v. Se. Pa. Transp. Auth., Red Arrow Div.*, 982 F.2d 892, 895 (3d Cir. 1993). While the evidence on this point is far from conclusive, Ms. Zelesnick has shown just enough for her ADA retaliation claim to survive the rigors of summary judgment analysis.

### iii. Pretext

Defendants next argue that Ms. Zelesnick cannot establish pretext. "In the context of a summary judgment proceeding, the question is not whether the plaintiff proves pretext, but rather whether the plaintiff raises a genuine issue of fact regarding pretext." *Caldwell v. KHOU-TV*, 850 F.3d 237, 242 (5th Cir. 2017) (quoting *Thornbrough v. Columbus & Greenville R.R. Co.*, 760 F.2d 633, 646 (5th Cir. 1985), *abrogated on other grounds*, *St. Mary's Honor Ctr. v. Hicks*, 509 U.S. 502 (1993)).

15

Defendants argue that Ms. Zelesnick cannot show pretext because Ms. Warren communicated her concerns regarding Ms. Zelesnick's work before Ms. Zelesnick engaged in protected activity.   Courts have noted that where "an employer expresses concern about an employee's performance deficiencies prior to the time the employee engages in allegedly protected activity, no retaliatory inference arises." *Helfrich v. Lehigh Valley Hosp.*, 2005 WL 670299, at *20 (E.D. Pa. Mar. 18, 2005).

But construing the evidence in the light most favorable to Ms. Zelesnick, there is an issue of fact as to whether Ms. Zelesnick's time off for doctor's appointments and anticipated time off for shoulder surgery were the cause for the antagonism between Ms. Zelesnick and Ms. Warren. While Ms. Warren testified that Ms. Zelesnick was distracted, had not developed a routine, and was making a variety of mistakes, Ms. Zelesnick disagreed and stated that she had taken Ms. Warren's advice into account, was in general performing her job adequately, especially considering her short time at Fox Chase.   Notably, Defendants have not introduced any documentary evidence to prove that Ms. Zelesnick was making mistakes. While Defendants stated during oral argument that this is due to Ms. Warren having corrected the errors so that there is no paper trail, the absence of documentary evidence makes this a question of credibility, inappropriate for resolution at summary judgment.   And if the jury credited Ms. Zelesnick's testimony that she was performing her work well, it could also conclude that Defendants' proffered reason for firing Ms. Zelesnick was pretextual.   Therefore, Defendants' motion for summary judgment on Ms. Zelesnick's ADA Retaliation claim is denied.

## B. ADA Failure to Accommodate

To state a claim for failure to accommodate under the ADA, a plaintiff must show that: "(1) [s]he was disabled and h[er] employer knew it; (2) [s]he requested an accommodation or assistance; (3) [her] employer did not make a good faith effort to assist; and (4) [s]he could have

been reasonably accommodated." *Capps v. Mondelez Glob., LLC*, 847 F.3d 144, 157 (3d Cir. 2017) (quoting *Armstrong v. Burdette Tomlin Mem'l Hosp.*, 438 F.3d 240, 246 (3d Cir. 2006)).

It is not clear what requests for accommodation Ms. Zelesnick argues that Defendants did not accommodate. Her complaint states that the accommodation she sought was "including but not limited to intermittent and block time off from work to care for and treat for [sic] serious health conditions." (Doc. No. 1 at 9.) The Court assumes that this refers to both the intermittent time that Ms. Zelesnick took off in the middle of the workday for doctor's appointments, and the block time she requested for her shoulder surgery. Yet in her brief in opposition to summary judgment, Ms. Zelesnick mentions only the block time that she took off at the end of August, abandoning her argument of failure to accommodate intermittent time off. *See* (Doc. No. 24-1 at 57.) Indeed, even if Ms. Zelesnick has not abandoned this argument, it has no merit because she did indeed take this time off, even though she did not ask or otherwise apply for it, and Ms. Warren never told her that she could not. *See* Def. Ex. 2 at 115:23-116:1. In other words, Defendants never denied her "request" to take time off for medical appointments.

Ms. Zelesnick's argument of a failure to accommodate her claim for block leave also fails. Her application for FMLA leave was granted before she was terminated. While these facts state a claim for retaliation, as noted elsewhere, it does not state a claim for a failure to accommodate. Therefore, the Court grants Defendants' motion for summary judgment as to Ms. Zelesnick's ADA Failure to Accommodate Claim.

## C. ADA Disability Discrimination

To make out a prima facie case claim of disability discrimination under the ADA, Ms. Zelesnick must first show that: "(1) [she] is a disabled person within the meaning of the ADA; (2) [she] is otherwise qualified to perform the essential functions of the job, with or without reasonable accommodations by the employer; and (3) [she] has suffered an otherwise adverse employment

17

decision as a result of discrimination." *Eshleman v. Patrick Indus., Inc.*, 961 F.3d 242, 245 (3d Cir. 2020). If she does so, the burden shifts to Defendants "to articulate a legitimate nondiscriminatory reason for [the plaintiff's] termination." *Matero v. Chipotle Mexican Grill, Inc.*, 2018 WL 4510494, at *2 (E.D. Pa. Sept. 20, 2018) (citing *Jones v. Se. Pa. Transp. Auth.*, 796 F.3d 323, 326 (3d Cir. 2015)). The burden then shifts back to Ms. Zelesnick to prove by a preponderance of the evidence that Defendants' "stated reason is a pretext for discrimination." *Id.*

Ms. Zelesnick's disability discrimination claim is almost indistinguishable from her retaliation claim. The difference is one of focus. Ms. Zelesnick's disability discrimination claim argues that she was terminated because of her medical conditions. Her retaliation claim argues that she was terminated because of *treatments for* her medical conditions. "The substantive provisions of . . . [the] ADA seek to prevent injury to individuals based on who they are, while the anti-retaliation provisions seek to prevent harm to individuals based on what they do." *Johnson v. McGraw-Hill Cos.*, 451 F. Supp. 2d 681, 710 (W.D. Pa. 2006).

As stated above, there is some modicum of evidence to substantiate Ms. Zelesnick's ADA retaliation claim. But there is none substantiating her disability discrimination claim. There is simply no evidence that Ms. Warren held Ms. Zelesnick in contempt because she had problems with her legs, knees, back, bladder, or with depression. When Ms. Zelesnick told Ms. Warren about her knee, shin, shoulder, and bladder conditions, Ms. Zelesnick characterized Ms. Warren's response as: "She was like, okay. No big deal." Def. Ex. 2 at 244:1-3.

Because there is no evidence in the record that Ms. Warren fired Ms. Zelesnick because of her ailments, as opposed perhaps to the care she sought for these elements, the Court grants Defendants' motion for summary judgment on Ms. Zelesnick's ADA Disability Discrimination claim.

18

## D. ADA Hostile Work Environment

To state a claim for hostile work environment under the ADA, a plaintiff must demonstrate that "(1) she is a qualified individual with a disability under the ADA, (2) she was subject to unwelcome harassment, (3) the harassment was based on her disability or request for an accommodation, (4) the harassment was sufficiently severe or pervasive to alter the conditions of her employment and create an abusive working environment, and (5) the employer knew or should have known of the harassment and failed to take prompt, effective remedial action." *Lowenstein v. Catholic Health E.*, 820 F. Supp. 2d 639, 646-47 (E.D. Pa. 2011).

While Defendants dispute elements 2 through 5, for purposes of summary judgment, Defendants' brief argues only the third element. Defendants thus argue, for purposes of this motion, that even if Ms. Zelesnick was harassed, and even if the harassment was severe or pervasive, the harassment was not based on her disability or request for accommodation.

The problem with Defendants' choice to not contest severity in their brief is that any statement—no matter how innocent or isolated—is presumably actionable. And while Defendants note that Ms. Warren only yelled at Ms. Zelesnick once for taking a long doctor's appointment, Ms. Zelesnick testified that Ms. Warren made many comments short of yelling—yet by her account intrusive and unpleasant—asking Ms. Zelesnick how long her appointments would be. Because severity and pervasiveness are not contested, the only question before the Court is whether these comments were based on Ms. Zelesnick's requests for accommodation. Neither party contests that they were. Because there is no question that Ms. Warren made some statements based on Ms. Zelesnick's request for accommodation, and because Defendants do not contest that these comments were severe or pervasive in their brief, the Court will deny Defendants' motion for summary judgment as to Ms. Zelesnick's ADA Hostile Work Environment Claim.

19

## III.    FMLA Causes of Action

### A.  FMLA Interference

Ms. Zelesnick argues that Defendants interfered with her FMLA rights in four ways: (1) by terminating her for exercising her FMLA rights; (2) by failing to notify Ms. Zelesnick of her FMLA rights; (3) by failing to categorize time taken for doctor's appointments as FMLA leave time; and (4) by pressuring her to delay her FMLA leave.

The Court will first consider Ms. Zelesnick's argument that termination interfered with her FMLA rights. Defendants argue that where a plaintiff claims that FMLA leave was a reason for termination, the claim must be considered as a claim for retaliation, not interference. Defendants cite a Third Circuit appellate case for this proposition. *See* (Doc. No. 18 at 38 (citing *Conoshenti v. Pub. Serv. Elec. & Gas Co.*, 364 F.3d 135, 147 (3d Cir. 2004))). But *Conoshenti* says no such thing. *See id.* Rather, the Third Circuit Court of Appeals has clearly stated that such allegations state a claim for both interference and retaliation. *See Erdman v. Nationwide Ins. Co.*, 582 F.3d 500, 509 (3d Cir. 2009) ("[F]iring an employee for a valid request for FMLA leave may constitute interference with the employee's FMLA rights as well as retaliation against the employee."). Thus, the termination allegation underlying Ms. Zelesnick's FMLA Interference claim survives.

Ms. Zelesnick lacks standing for her other three FMLA Interference allegations because none of these claims allege an injury in fact.[5] First, her injury is not "concrete and particularized" because she does not show how any of the alleged violations caused her concrete harm. *See, e.g.*, *Lujan v. Defs. of Wildlife*, 504 U.S. 555, 560 (1992). Even assuming that Defendants failed to

---

[5] While neither party raises this standing issue, "Federal courts have an independent duty to determine subject matter jurisdiction, even where the matter is raised for the first time . . . on the court's own motion." *City of Kansas City, Mo. v. Yarco Co.*, 625 F.3d 1038, 1040 (8th Cir. 2010) (citing *United States v. Hayes*, 515 U.S. 737, 742 (1995)).

timely notify Ms. Zelesnick of her FMLA rights, which is in grave doubt, Ms. Zelesnick does not state how this failure caused her any damage.

The same is true for Defendants' failure to categorize intermittent leave as FMLA leave. FMLA leave is unpaid, and Ms. Zelesnick does not argue how a retroactive categorization of this time as FMLA leave would benefit her. Finally, even assuming that Ms. Zelesnick was pressured into delaying FMLA leave, Ms. Zelesnick does not show how this injured her. If anything, Ms. Zelesnick would have been entitled to less salary, because she would not have received a paycheck during that time.

These same allegations also fail to meet the redressability requirement for standing. Ms. Zelesnick does not demonstrate that it is "'likely,' as opposed to merely 'speculative,' that the injury will be 'redressed by a favorable decision.'" *Lujan*, 504 U.S. at 561. Defendants' motion for summary judgment on Ms. Zelesnick's FMLA Interference claim is therefore granted in part.

### B. FMLA Retaliation

Ms. Zelesnick argues that Defendants retaliated against her for taking intermittent leave, and for applying for FMLA leave to receive surgery on her shoulder. Both of these events are protected activities under the FMLA. *See, e.g.*, *Brady v. United Refrigeration, Inc.*, 2015 WL 3500125, at *7 (E.D. Pa. June 3, 2015) (noting that the FMLA entitled an employee to intermittent leave with little notice because the leave was medically necessary). As to FMLA leave for shoulder surgery, Defendants do not dispute that it is protected activity, but only dispute causation and pretext. But issues of fact preclude summary judgment on those two issues for the same reasons discussed above in connection with Ms. Zelesnick's ADA Retaliation claims. Defendants' motion for summary judgment on Ms. Zelesnick's FMLA Retaliation claims is therefore denied.

21

## Conclusion

For the foregoing reasons, Defendants' motion for summary judgment is granted in part and denied in part.  An appropriate order follows.

BY THE COURT:

GENE E.K. PRATTER
UNITED STATES DISTRICT JUDGE